May it please the Court, my name is Paul Court. With me today at Council's table is Brent Newell. We will be splitting our time this morning, and ideally we'd like to save about five minutes for rebuttal. I want to focus on two of the glaring defects in EPA's approval of the 2004 one-hour ozone plan for the San Joaquin Valley. First, the fact that the inventory of emissions in the 2004 plan was known to be outdated and inaccurate by the time EPA acted. And second, the fact that by the time EPA acted, air quality monitoring data showed that the plan's demonstration of attainment was simply impossible. The first problem with EPA's approval of the 2004 ozone plan was that the inventory of emissions upon which the entire plan was based significantly underestimated the emissions from mobile sources. The Clean Air Act requires plans to include a comprehensive, accurate, current inventory of actual emissions from all sources of the relevant pollutant or pollutants in the area. The purpose of the inventory is to figure out where the pollution is coming from and how those emissions translate into ambient concentrations, in this case in the valley. Ozone is created by the reaction of volatile organic compounds, VOCs, and nitrogen oxides, NOx. So the inventory for the ozone plan needs to quantify the emissions of VOCs and NOx from sources in the valley. Getting the inventory right is critical to understanding the relationship between emissions and ozone levels, how these emissions need to be reduced, and where to target the rules to control those emissions. The inventory used in the 2004 plan turned out to be significantly wrong. It was based on an old model prepared by the state that assigned emissions to diesel trucks based on where they were registered instead of where they drove. The state updated this model in 2007. The result of this update was a radical increase in the estimated emissions from NOx in the valley. EPA was well aware of these changes to the model and the increases in the projected emissions in the valley. EPA approved the state's new model in 2008. And in 2007, EPA had before it a new submitted inventory that came in with the 8-hour ozone plan for the valley. Was the 2007 data, was this in connection with the 8-year plan? The 8-hour. I'm sorry, the 8-hour plan. Yes, yes, yes. The 8-year plan is the 1-year proposal the state submitted here, it turns out. Right. It's the 1-hour, the old 1-hour standard adopted in 1987. So this data was submitted in connection with the 8-hour plan. Is it fungible? Is the data translatable between the two plans, or does it measure something different that's unique to one plan or the other? No, emissions are emissions. So, for example, in the 2004 plan, they had numbers for how much NOx is emitted by diesel trucks in the valley, or predicted to be emitted during various times. So, for example, and we have this in our opening brief, in the 2004 plan they estimated that diesel trucks would emit in the year 2008 roughly, I think it was 158 tons per day. In the 2007 8-hour ozone plan, they estimated those same emissions would be more than double that. These are entirely fungible numbers. They are. The concern that EPA expresses in its approval of the plan with Federal Register and in the site's memo in the D.C. Circuit case is that we're always making improvements in our data sets. And if we have to use the best data available at any given moment, we just may be in this sort of endless cycle of having to improve things and never really get to the final place. Right. How costly would it have been to the state or to EPA? What kinds of delays would there have been if EPA had tried to update the data set or required the state to update its data set? I actually can't answer that question. You know, the ironic thing here is that throughout this six-year period, the state and the district were submitting new information, including, if you look in the final rule, in August of 2009, after EPA had proposed action on this plan, the state submitted more information because EPA had proposed to disapprove a component of the plan. The state submitted more information saying, No, that's not right, which led EPA to re-propose and then approve this one defect in the plan. This is a constantly evolving process, and EPA here is indicating that it will cherry-pick what new information it needs in order to support approval and what information it will not require to be updated if that would be difficult or that would undermine their approval. Again, as we said in our reply brief, Congress laid out not only a schedule for how this thing, you know, this whole process was going to work, but it laid out specific requirements because there had been a history of failures to attain these standards, of bad inventory information being submitted. Congress's intent here was to clean up the air and to get meaningful attainment plans. So any interpretation of the statute, and really we should be focusing on the statutory language, any interpretation of the statute whereby EPA says, Well, it doesn't matter if the information is old and outdated. It doesn't matter if we know that it's incorrect. This is a box to be checked. That's all Congress required. Are you contesting the conclusion of the D.C. Circuit that it is not unreasonable or not arbitrary and capricious for EPA to rely on what may not be the most current data, if it was at least current at the time of submission, if EPA has acted promptly? Well, it's not even that. Again, this case I think is very distinguishable from the Sierra Club case in the D.C. Circuit. In that case, EPA had the inventory in front of it, and just before EPA was about to approve, there was an update in the model, the model that would eventually be used to generate a new inventory. That's not the case here. We have two inventories that have been submitted to EPA. The modeling has been done. Everything has been updated. EPA has in front of it two numbers. One says diesel emissions are going to be 158 tons per day, and the other says it will be over 300. EPA can't reconcile these numbers. There's no justification that says they can ignore facts that show that the plan will not work. And, again, I think this is really a red herring argument because this is not a case where we are chasing down new information. This is a case where the information is in front of EPA at the time it has to make its decision. Counselor, if I could ask you a question, please. Is the technical issue under the Clean Air Act, whether a current and accurate SIP means current and accurate when it's submitted or means current and accurate when it's approved? Well, let me give you two responses. That is the issue, and we believe the only interpretation that upholds Congress' intent here is that it be current and accurate at the time EPA approves it. But even if you accepted EPA's argument that these only have to be current and accurate at the time they're submitted, the fact is this inventory was not accurate at the time it was submitted. And EPA, through that review process where they, under Section 110L and the other review requirements, they had to say, is this inventory accurate? And at the time they acted, there was no way they could say that this inventory was ever accurate because the modeling upon which it was based was flawed, and they knew that it was flawed. Let me ask you another related question. Would it be, what would happen if we assumed that the Clean Air Act issue didn't have to be reached? Would it be possible to say we don't have to decide what current and accurate means in this context under the Clean Air Act because notwithstanding, it would be arbitrary and capricious under the EPA to approve a plan ignoring a big part of the problem under the rationale of State Farm? Exactly. Would that be possible? Yes, absolutely. On remand, could the, if that was remanded just with an EPA ruling and we hadn't reached the Clean Air Act ruling, could the agency then give an explanation and make the same decision again? We would hope not. I mean, part of what's unique about this case is that the delay was extraordinary. We wouldn't face this issue if EPA were acting under the timelines outlined in the statute. It wouldn't make any difference how you interpreted the statute if EPA were acting in a timely fashion. It's just because of the extreme facts of this case that we're sort of having to confront this issue. Counsel, if we were to agree with you on this issue, how many of your remaining issues become either moot or irrelevant? Well, I don't think they become moot, but certainly, you know, courts, if there's justification for sending the plan back, then there's no need to resolve this issue. But you would still want a ruling on the question of including the state-adopted regulations. Yes, which is what Mr. Newell will be addressing. But probably you would not require the second issue that you're about to address, which is the question of whether the 2010 deadline was – that one drops out of the case, if we agree with you on this first issue. Again, if EPA were acting in a timely fashion, we wouldn't be facing this kind of factual situation. But as to remedy – and I want to just highlight one thing, which is we have specifically asked for make-it-sure of the approval here. And part of it is because, frankly, we've seen these games that EPA has played in the Los Angeles area, where EPA will fall back and say, we've already approved the attainment demonstration. The one-hour ozone standard's been revoked. We don't need to do any more. A make-it-sure sends the message that this plan did not work. It never should have been approved. EPA needs to go back and require a new plan. So I hope that, in your consideration, you will also focus on that remedy issue. And, counsel, you think if they had to do a new plan, they would not rely upon the old emissions at that point? They would have to have a new plan submitted, because the plan that is currently – has been submitted didn't work. They missed their attainment deadline. So a new plan would have to be submitted. So even under their test of, you know, current and accurate at the time it's submitted, we would be looking at a new submittal, and we would be able to judge the accuracy of the new inventories submitted at that time. Okay. Thank you. May it please the Court, my name is Brent Newell. This plan is like a house that's built on a foundation of sand. The whole point in the cooperative federalism of the State Implementation Plan is that the plan is a federally enforceable contract between the State and the EPA, a contract which also allows citizens to enforce the plan's promises and measures. Title I of the Clean Air Act says, number one, that EPA sets the health-based standard, number two, that the State comes up with the plan and the measures that are going to reduce emissions by the deadline in order to meet that standard, and three, that EPA approves the plan and the measures. Once the plan is approved, it has the force and effect of federal law. The problem with this one-hour attainment plan is that it lacks a solid foundation. The majority of the reductions that the plan uses come from State measures adopted by the California Air Resources Board that have not been submitted to EPA and have not been approved by EPA. Those measures are thus not federally enforceable by EPA or citizens and can be weakened by the Air Resources Board at will without the backsliding protection that's in the Clean Air Act. Accordingly, EPA's approval of the plan, given that, violates the Clean Air Act. Now, I've got three short points to make on this. The plain language of the Act resolves this issue. Second, as a result, EPA's approval of the attainment demonstration, the reasonable-for-the-progress demonstration, and the contingency measures violate the Clean Air Act. Third, EPA's contrary interpretation is not saved by Section 193. So, applying Step 1 of the Chevron Standard of Review, the plain language speaks directly to the issue and resolves it. EPA may not approve a plan that relies on unapproved measures. Section 172 says, quote, Are there, has the State submitted SIPs in other areas of the State? Yes. And in those SIPs, did they include, did they provide the regulations for approval by EPA? No. Okay. So, what the State did here is similar to what it has done in the past? That's correct. Okay. And has anybody ever challenged that before? No. Okay. I'm sort of curious as to why. I guess maybe I'm asking a litigation strategy question, but I'm sort of curious because it does go, I think, to EPA's argument that this is, that California is a special case and has been treated as a special case for a long, long time. I cannot speak to why other EPA approvals have not gone unchallenged. Other than the one for the South Coast that's the subject of the air case, EPA hasn't acted on an ozone plan since the late 1990s. So, I have no knowledge whatsoever why this issue wasn't raised then, Judge Bybee. Okay. So, Section 172 says that the plan provisions shall include these enforceable emission limits. Section 182 says that reductions are creditable for regional progress, quote, to the extent they have actually occurred from the implementation of measures required under the And Section 172, again, says that contingency measures shall be included in the plan. The plain language of the statute speaks directly to the issue, and that's the end of the matter. Now, without these measures in the SIP, EPA's approval violates the Act. That's my second point. The attainment demonstration relies on 79.3 tons per day of volatile organic compound reductions and 97.2 tons per day of NOx reductions. From State-adopted measures. That constitutes the majority of the reductions that the plan uses. EPA's approval violates the Act because those haven't been approved. Reasonable-for-the-progress and contingency measures also suffer the same fate. They rely on waiver and non-waiver measures. They're not approved in the SIP. EPA's approval of those demonstrations accordingly violates the Act. Now, EPA has this argument that it articulated in its approval that its interpretation was somehow ratified by Congress during the 1990 amendments to the Clean Air Act. This Court should reject that argument for three main reasons. First, the Clean Air Act is unambiguous on this point, and thus there can be no ratification of EPA's interpretation. Second, EPA has offered no evidence whatsoever that shows Congress even knew that EPA had this interpretation to exclude waiver measures from a SIP. Thus, there can be no ratification. And third, Section 193 does not apply on its face because EPA did not promulgate or issue this interpretation before 1990. In fact, EPA's interpretation about waiver and non-waiver measures arose for the very first time in this rulemaking when it was raised in public comment on their first proposed approval. They then re-proposed with this interpretation. So that's all I have today, unless the Court has any other questions. I have no questions. We have two and a half minutes left for rebuttal. Judge Gould. He said he had no further questions. Thank you. Good morning. May it please the Court, my name is Monica Derbys Gibson. I'm here on behalf of the United States Environmental Protection Agency. With me at council table are Jeanne Hong and Jefferson Whaling from the Office of Regional Counsel at EPA Region 9. We would like to cede four minutes of our time to the San Joaquin Valley United Air Pollution Control District, the intervener on our behalf. You may proceed. Thank you. EPA appropriately exercised its discretion to approve the state implementation plan for the San Joaquin Valley for the one-hour National Ambient Air Quality Standard for ozone. EPA appropriately relied on the information that was presented to it in the SIP, which was comprehensive, current, and accurate at the time this information was submitted by the state. Further, EPA reasonably interprets the Clean Air Act to allow emission reductions that result from California measures taken to control emissions from mobile sources for which EPA has waived the federal preemption provided under Section 209 of the Clean Air Act to be counted in the steps toward attainment that were provided in the SIP for the one-hour ozone standard. Finally, EPA reasonably approved the SIP before the beginning of the 2010 ozone season, based in part on its determination that California had adequately demonstrated that the San Joaquin Valley could have ozone concentrations below the required level in the 2010 ozone season. The Clean Air Act directs EPA to establish standards that limit the allowable concentrations of pollutants in the air at the National Ambient Air Quality Standards. The Act also directs EPA to designate areas of the United States as attainment or non-attainment, and the Clean Air Act establishes a federal-state partnership by which the states primarily develop measures to bring their non-attainment areas into attainment, and the Clean Air Act contains very specific provisions about what needs to be included in state implementation plans. There are additionally specific requirements for attainment plans for ozone non-attainment areas. So the San Joaquin Valley developed its state implementation plan based on the information that it had before it. California submitted that plan to EPA, and EPA relied on information that were current and accurate at the time of submittal in approving the plan. Petitioners characterize the submittal as saying that emissions are emissions, and that's unfortunately the issue is more complicated than that. The SIP contained an attainment demonstration and contingency measures to show that the reductions provided for in the proposed SIP would meet the appropriate deadlines, would bring the area into attainment, would take the steps. So the information in the SIP included both a base year inventory, which used emissions data from the year 2000, and then projected emissions inventories, projected baseline inventories for the years 2008 and 2010. So those baselines show how the regulations that are included in the state implementation plan to require emission reductions will bring the area toward attainment. The additional information the petitioners referenced was for a different ozone standard that is measured on a different basis. It's measured using an eight-hour averaging period versus a one-hour averaging period. And also, the data that were before EPA were from different – were projected emissions data, not baseline data. So we don't have a single fungible universe of data. What we have is two sets of data for a similar pollutant and different standards. And these data were for – from different locations, Arvin and Bakersfield. And the projections covered different time periods. The projections in the projected baseline emissions for the eight-hour standard were for 2010 and 2020. So, counsel, are you telling us then that EPA could not have updated its data set? The information came to EPA from the San Joaquin Valley District and was submitted by CARB. So the information that was before EPA was not fungible. And the first inventory, is that 2002? The first inventory, the baseline – For the SIP. Was that 2002 data? It was – the base year inventory data were from 2000. It was 2000. Okay. And the updated data was 2007. Is that correct? Yes, Your Honor. Okay. So we have a seven-year gap in there. And is the 2007 data not usable by California? The later data were not usable because the projections were done for a different ozone standard. So the projections were done using a different – what happens is you collect actual data that show the concentrations of the pollutants that form ozone in the air at specific locations. And then those form the base year actual emissions inventory. And then there are two sets of projections, one for the 2003 SIP and one for the 2007. Let's take an example. The Sierra Club says that California miscalculated the truck emissions because it based it first on registration rather than where the diesel trucks were actually being driven. So could California have updated its application using the new inventory? Your Honor, I don't know if the data from the actual emissions data collected in the year 2000 would have been usable in the 2007 model source inventory. And I also don't know if that model would have been usable for the one-hour ozone standard. My understanding is that that has not occurred. There has been no updating of the emissions data for the one-hour standard. Who's responsible for actually providing the SIP? Is that CARB? Yes. CARB's not a party here? No, Your Honor. They haven't protested anything that the Sierra Club is urging us to do or anything that you're defending? So we don't really know what California thinks about all of this. Well, we have San Joaquin Valley here. Also, just to mention the air case, which Petitioner's Counsel mentioned. There, it's a similar point. There, California did go back, and they did recalculate, and they identified a discrepancy in their SIP. So California took the measures to update its SIP inventory. So we have a very different factual situation here. The CITES memo and the D.C. Circuit case, I think which was also called Sierra Club, both seem to contemplate that even if there are improvements in the data set, that at some point you have to declare the game done and have to decide it on the information that you've got. But we had an extraordinary delay here between the time that the SIP was filed and the time that EPA approved it. Can you give us an explanation as to why we had such a delay? Your Honor, the world of state implementation plans is constantly in flux. At the time period, the one-hour ozone SIP was submitted in 2003. California itself did updates of the information in the SIP a couple of times, as Petitioner's pointed out. In the meantime, simultaneously, EPA was developing and implementing the new eight-hour ozone standard and also developing a new PM2.5 standard, particulate matter less than 2.5 micrograms per cubic meter. And so in essence, there were many things going on. There were many moving parts. It is not an ideal situation. We will agree. But the principle of the cases that we cite in our brief recognizes that there are a lot of moving parts. And so at some point, you do have to say, for this particular piece, for this particular moving part, we're going to take action based on what we have, recognizing that there's another moving part somewhere else. You know, in this case, there's the coming implementation of the eight-hour ozone standard. And so EPA has now turned to focus on implementation of the eight-hour ozone standard and has been taking action on the SIP submittal for that. But with the congressional requirement that you have accurate current data, when there's a delay like this, it would seem that at some point you're going to have to update the data because 2,000 data projected 10 years out we know is likely to be inaccurate. The farther out the projections go statistically, the more chance there is that the data is going to be wildly inaccurate. Your Honor, I think... And so I guess to get to forgetting, leaving this case aside, do you think it's reasonable to interpret the statute as saying that the EPA can only rely on the data at the time of submittal when there's a delay in responding? As entities are implementing the provisions of the Clean Air Act, the ambient air is generally, and this is a huge generalization, I admit, generally getting better. I mean, emissions controls have gotten more stringent in the 10 years since... Well, in the 21 years since the 1990 amendments were passed and in the approximately 10 years since the 8-hour ozone standard was promulgated. So we're... That was wrong. I'm sorry. It was promulgated in 1997. I think generally if you've got data that are older, those data do not reflect controls on emissions that have been implemented in the time that may have elapsed. So you're taking a more pessimistic view of the actual air quality. Well, that may be true in terms of how it's played out now, but I'm talking about statutory interpretation. Is it EPA's position that the measurement is only appropriate at the time of submittal in terms of what's accurate, what fulfills the statutory requirement of accurate and current? I think EPA's position is that EPA can work with the state to, if it's appropriate... So that's a no? I'm sorry? I mean, I think you're not answering the question or maybe trying to answer it accurately, but if I'm reading your answer correctly, you're saying that, in fact, EPA does update data, use updated data. It does not... The data is not frozen in time at the time of submittal. Well, where it's appropriate, EPA is not restricted from communicating with the state or reviewing data as in air, reviewing data that are updated by the state. But EPA's interpretation of this provision of the statute is current and accurate at the time of submittal. So you're saying that EPA can pick and choose what data it decides to update and what data it decides not to update? EPA is really not the prime... Again, this is a federal-state partnership here, so EPA is really not driving the truck. No, but the problem is delay. I mean, if this were all happening in a short period of time, we wouldn't have these issues. But when there's a decade-long gap and you're still relying on projections, then by definition the data is outdated when the rule, when the approval comes through. Well, Your Honor, the projected emissions were ultimately the method, ultimately the base year emissions inventory was used to project future emissions. And those projections were appropriate given the situation and given the parallel implementation of the eight-hour ozone plan. And EPA appropriately exercised its discretion. I'd like to use a couple of minutes to talk about the recognition of emission reductions that come from measures approved under the waiver of federal preemption in Title II of the Clean Air Act. These measures obtain the waiver of federal preemption through a very stringent process. The Clean Air Act doesn't really provide the administrator of the EPA with a lot of discretion in that. California's controls on mobile sources were in existence before the Clean Air Act required controls on mobile sources. And the Clean Air Act accordingly recognized California's pioneering efforts in this area and accordingly established a procedure whereby California could enact control measures for motor vehicles and engines to be used in California, sold and used in California. And the normal federal preemption of regulation on mobile source emissions, which makes sense, right? You don't want a set of 50 different car standards for 50 different states. So we've got federal and we've got California. And so California is able to submit for approval for waiver of federal preemption by EPA its own mobile source emission control measures. And then EPA is directed to approve the federal preemption unless it finds that California standards aren't as protective as the federal standards or California's determination that it needed its own standards was arbitrary and capricious. So here we have a process that undergoes public notice and comment And accordingly, the reductions that are counted on in the application of these control measures are countable for the SIP. California can rely on these reductions. I think Judge Bobby, you had asked my colleague about what happens in other jurisdictions. And other jurisdictions, other states are allowed to count on the federal mobile source regulations. Actually, my specific question was whether California and other places other than San Joaquin Valley had submitted SIPs without submitting its regulations to the process. And I think his answer was, yes, that has been EPA's practice in the past. So it looks like what was done in San Joaquin is not unusual from what's been done elsewhere in California. Now, the question I asked him was the litigation question. How come it hasn't been challenged there? And now the question I think you have to answer is, why doesn't the Clean Air Act require California to submit its regulations? It appears that there's some enforcement questions that are raised by that. That is, there are people who may wish to challenge the federal action and can't do that unless the California regs have been submitted as part of the SIP. Well, the California actions are a parallel to the federal. So when EPA promulgates a regulation setting emission standards for a truck engine, that standard can be challenged in federal court. And when California promulgates a California standard, that standard can be challenged through the California process. Similarly, if EPA decides to revise a federal standard, that revision can be challenged. A state like Arkansas can count the reductions that are due to federal emission controls in its SIP. And similarly, jurisdictions in California can count the reductions from California measures in their SIPs. And I see I'm running low on time. Finally, I would like to point out that petitioners conflate two different processes in the Clean Air Act. In objecting to EPA's use of the data in the 2003 SIP, there is the attainment demonstration, which is submitted as part of the SIP. It is forward-looking. It is a projection of whether the emission controls required under the SIP are going to bring the area into attainment. And then there is the attainment determination, which is based on monitored data at the time that as of after the time for attainment has passed. So EPA reasonably in March 2010 looked forward and reasonably approved the attainment demonstration, the forward-looking part of the SIP. And its approval was a reasonable interpretation of the Clean Air Act. So has EPA approved the California SIP as an attainment determination? California has not yet made that submittal, Your Honor. And I will allow my counsel from San Joaquin to conclude. Well, you've used up all of her time, but we're going to give you the full four minutes. I saw you anxiously looking up as the time was going down. So would you put four minutes on the clock? It's important to hear from the district. Thank you, Your Honors. Good morning. Catherine Redmond for the Air District. I'd just like to clear up a couple points here. First, this plan is largely, although California does submit measures to our plan, it's largely the district's plan. We bear the burden of developing it and implementing it, so I may be able to answer some of your questions. Regarding the inventory, the inventory that we used in the one-hour plan was the most current and accurate at the time it was submitted. The only moving part here is the mobile emissions model, which is the MFAC model. Our inventory for the one-hour plan relied on the 2002 MFAC model, which was the most current at the time that we did the inventory. What changed between the one-hour plan and the eight-hour plan is that California updated that mobile emissions, that MFAC model, and it showed that mobile emissions were going up. So, therefore, the entire inventory went up. But what's happened since the briefs were submitted in this case is California has now updated that mobile emissions model again, and it's showing the emissions are going back down. And so this explains exactly why the District of Columbia Circuit's holding in the Sierra Club case and EPA's longstanding policy that you have to freeze these requirements in place at some point makes sense because these things are always changing. Well, I don't disagree with you on that. Just that when there's a case of long delay, freezing it in place as of the submittal date doesn't make a lot of sense in terms of the statute, does it? But there was also really nothing in the eight-hour ozone plan that demonstrated that the one-hour ozone plan couldn't work because all of the modeling conducted for the eight-hour ozone plan took that inventory and then modeled it towards the eight-hour standard. So, basically, what that means is because the two standards, the peak ozone concentrations are measured over different time periods and you're looking at a different target, the eight-hour plan said nothing about the valley's ability to attain by the one-hour standard. In fact, what EPA did have in front of it via our 2008 clarifications to the one-hour ozone plan was evidence that not only was the valley meeting its rate of progress milestones, but we were also achieving substantially more emissions reductions from our control measures than we had committed to achieving under the one-hour ozone plan. So the evidence before EPA was, look, the valley's on target. They very well may have air quality at the level of the standard by the year 2010. And that's what the modeling for the one-hour plan showed. So based on that, it was reasonable for EPA to say, hey, we think this plan could work, and as long as the valley has air quality at the level of the standard by 2010, they would then be eligible for the first of two one-year extensions, thereby giving us three years to attain. And that's been EPA's past practice. And I don't think it's unreasonable here, given the evidence before EPA, for it to follow that past practice. One other practical issue that I'd like to point out is that just, Judge Bybee, you asked how burdensome would it be to have to go back and redo the one-hour plan. Well, extremely burdensome, because as I just mentioned, the modeling for the eight-hour plan is not indicative at all of the one-hour standard. So not only would we have to go back and redo the modeling, and if you look at the appendices, the modeling appendices for the plans, they're hundreds of pages long. It's quite a feat. But also now, what inventory do we use? Because as I just mentioned, there's now a new emissions model. The emissions are now going down, so we'd have to create a new inventory. So this is all very time-consuming, and at a time where now, you know, we're so far down the road that we've now triggered two other Clean Air Act provisions that we think will force the Valley into attainment regardless of this plan. The first is the contingency measure provision in Section 172C9, and the second is the non-attainment penalty fee provisions in Section 185. Now, for the Valley, those penalties are going to be $29 million per year on stationary and mobile sources. Under the plan that we've submitted to EPA to implement Section 185, we're going to use all that money to essentially buy emissions reductions through our grants program, and how that works is that we give people money to basically take old diesel trucks, old school buses, old farm equipment, and scrap it and buy the most current, cleanest equipment. And so not only is the $29 million a very good incentive for the Valley to attain the standard, but we believe that all the reductions that we will get as a result of that will basically force us into attainment. This is really one of those situations where what's happening on the ground is 10 paces ahead of the litigation. I mean, we've adopted our 8-hour ozone plan. We've adopted just about all the conceivable measures that we had come up with under that plan. And air quality in the Valley, despite the delay, which, you know, the Court may not look fondly on, air quality in the Valley has continued to improve and improve and improve the entire time this plan was pending before EPA. So unless the Court has any other questions. Judge Gould, any questions? There are no questions here. And thank you for providing me with that time. I'd just like to clarify a few points. First, with the district's last defense, of course, none of this is in the record, but we, you know, look forward to the next 1-hour ozone demonstration plan that can include all of these things that they believe will attain the 1-hour standard, and that seems like an appropriate exercise. I think it's also worth pointing out that this argument that the model continued to evolve, again, the latest model is not in the record. We're actually not sure that that statement's true. And, you know, the other thing EPA had in front of it was this air quality monitoring data showing that the violations continued, even increased in 2008, 2009, and as we explained in our request for vacature, they continued through 2010, and the area did not attain. So I'm not sure what progress means in that instance, but nothing, no 1-hour standard has been met and the plan has not worked. Finally, addressing some of EPA's arguments, there seemed to be confusion that somehow the emissions inventory depended on the standard. That's just not true. The emissions, again, are projected based on this mobile source model. The emissions depended on whether you treat the trucks as, you know, based on where they operate or where they're registered. Nothing in that model has anything to do with the ozone standard. EPA could see that the model projections were based on this faulty assumption and they should have responded accordingly. And, again, this idea, too, that EPA is the victim and they're dependent on the state to submit this information is also flawed. First, we saw in L.A. that the state is capable of updating this information. They did that. Second, we know from the record that EPA, again, proposed to disapprove portions of this plan. They drove the state to update the information. The state submitted the updated information. EPA had total control of the situation. They could have required the state to do more, submit more. They could have explained, we're not going to be able to approve the plan unless you provide us this information. EPA is not a passive participant here. This case, again, is not about whether EPA has discretion. As an heir, this is about whether EPA has discretion to ignore completely evidence that's in front of it that shows that there's a possibility that this plan is not going to work, and that's what EPA has done here. I know Mr. Newell has one point. Yes, certainly. We gave a little bit of time to either side, so we'll give you a bit of time. I just need about one minute, Your Honor. Thank you very much. I wanted to point out the enforceability issue a little bit because you, Judge Bybee, you asked a question of the other side about enforceability. Of course, the important thing of the measures being approved as part of the SIP, it makes them federally enforceable by EPA and citizens. It seemed that you were inferring that the point of enforceability was the ability to challenge them, challenge the measures themselves in federal court for whether they, you know, comply with various Clean Air Act measures. That would come in a petition for review just like this kind of case. You know, once EPA acts to approve the measures, an interested party could challenge them under Section 307 of the Clean Air Act. The real issue about enforceability is when they're not in the SIP, citizens in EPA may not go into federal district court and say, Your Honor, the state has not complied with these measures, because they're not implementing them, or sources subject to those measures are not complying with them. So that's the enforceability issue that is a very serious concern for us, is that there's nothing that EPA or citizens can do to enforce these core foundational measures of the plan. So that's the only point I wanted to make. Thank you very much. Thank you all for your arguments, very helpful, well-argued, and we recognize it's an important case. Thank you for your assistance. We'll be in recess.
judges: Thomas, Gould, Bybee